UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

_____

Appeal No. 22-2084
(Case No. 16-CV-712 (E.D. Wis.))

_____


JOHNNY JEROME JONES,

                Petitioner-Appellant,

    v.

REED RICHARDSON,

                Respondent-Appellee.

_____


Appeal From a Final Judgment Denying
Petition for Writ of Habeas Corpus and the Order
Entered in the United States District Court
for the Eastern District of Wisconsin,
the Honorable Brett H. Ludwig, Presiding

_____


SUPPLEMENTAL APPENDIX
OF PETITIONER-APPELLANT

_____



DAVID MALKUS
Assistant State Public Defender
Office of the Wisconsin State Public Defender
735 N. Water Street - Suite 912
Milwaukee, WI  53202-4116
(414) 227-4805

Attorney for Petitioner-Appellant

# TABLE OF CONTENTS

Decision of the Wisconsin Court of Appeals…………………………………………...101

Oral Ruling of the Milwaukee County Circuit Court……………………………..…110

Excerpts of Transcript of Proceedings on August 24, 2011……………………………116

## COURT OF APPEALS DECISION DATED AND FILED

### March 24, 2015

**Diane M. Fremgen**
**Clerk of Court of Appeals**

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* Wis. Stat. § 808.10 and Rule 809.62.

---

**Appeal No.    2014AP342-CR**

Cir. Ct. No. 2010CF000069

**STATE OF WISCONSIN**

**IN COURT OF APPEALS DISTRICT I**

---

STATE OF WISCONSIN,

      PLAINTIFF-RESPONDENT,

    V.

JOHNNY JEROME JONES,

      DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Milwaukee County: DAVID L. BOROWSKI, Judge. *Affirmed.*

Before Curley, P.J., Brennan, J., and Thomas Cane, Reserve Judge.

¶1    BRENNAN, J.    Johnny Jerome Jones appeals from an amended judgment of conviction entered after he pled guilty to one count of homicide by negligent operation of a motor vehicle, one count of hit and run resulting in death, and one count of hit and run resulting in great bodily harm. He argues that he

101

No. 2014AP342-CR

unequivocally invoked his right to counsel during a custodial interrogation, and that therefore, the circuit court erred in denying his motion to suppress the confession he gave to police subsequent to his alleged invocation.[1]  Because we conclude, upon reviewing the circuit court's findings, and listening to the audio recording of the police interrogation, that Jones did not unequivocally request counsel when he jokingly said, "So y'all can get a public pretender right now?," we affirm.

## BACKGROUND

¶2      On January 8, 2010, the State filed a criminal complaint, charging Jones with one count of second-degree reckless homicide, one count of duty upon striking an occupied or attended vehicle resulting in death, and one count of duty upon striking an occupied or attended vehicle resulting in great bodily harm.  The complaint arose from incidents occurring on December 31, 2009.

¶3      According to the complaint, Milwaukee police officers observed a Mercury Mountaineer that was missing a front license plate.  The officers followed behind the Mountaineer, which was owned by Jones's wife, and activated the police car's emergency lights.  The Mountaineer accelerated and proceeded through an intersection's stop light and struck another vehicle, resulting in the death of the passenger in the struck vehicle.

---

[1] Although a guilty plea generally waives all nonjurisdictional defects and defenses, there is an exception which permits appellate review of orders denying motions challenging the admissibility of a defendant's statement.  WIS. STAT. § 971.31(10) (2013-14); *County of Racine v. Smith*, 122 Wis. 2d 431, 434-35, 362 N.W.2d 439 (Ct. App. 1984).

All references to the Wisconsin Statutes are to the 2013-14 version.

2

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)

Exhibits to Habeas Answer
Page 206 of 992

Case: 22-2064     Document: 10     Filed: 07/27/2022     Pages: 63

No. 2014AP342-CR

¶4    After the complaint was filed, Jones turned himself in to the police and told police that he was the Mountaineer's driver at the time of the accident. Milwaukee Police Detectives James Hensley and David Chavez questioned Jones about the December 31, 2009 accident. An audio recording of that interrogation was played at the motion to suppress. During the interrogation the following exchange took place:

> DETECTIVE: You see the thing is, Johnny, is no one can, no one can speak for you. No one else, no witnesses, no one that was there.
>
> JONES: I know.
>
> DETECTIVE: We can't, nothing like that.
>
> JONES: I just feel so damn horrible.
>
> DETECTIVE: Well and that's, and that's why it's important to get your side out.
>
> JONES: So y'all can get a public pretender right now?[2]
>
> [LAUGHTER]
>
> DETECTIVE: You said it right, pretender . . . they're called public defenders.
>
> JONES: Oh yeah.
>
> DETECTIVE: Um, we, obviously due to the time right now, we can't, um . . .[3]

---

[2] The circuit court explicitly found that Jones said, "So y'all *going to* get a public pretender right now?," rather than, "So y'all *can* get a public pretender right now?" (Emphasis added.) On appeal, Jones argues, and the State agrees, that the audio recording reveals that Jones says, "So y'all *can* get a public pretender right now?" (Emphasis added.) Our analysis remains the same under either interpretation of the audio recording; as such, we use the version agreed upon by the parties on appeal.

[3] Detective Hensley testified at the suppression hearing that the interrogation began at 1:18 a.m.

3

No.  2014AP342-CR

> JONES:  How, how much, how much time is it anyway, you face off of reckless homicide?
>
> DETECTIVE:  Well it's, I believe it's between the max is 15 years, I believe.  Now I'm not, don't quote me on that, but . . .

¶5     Jones filed a pretrial motion, seeking to suppress the statements he made to Milwaukee police detectives.  At the motion to suppress hearing, Jones argued that his statement should be suppressed because, after he was read his *Miranda* rights,[4] he unequivocally invoked his right to counsel by stating, "y'all can get a public pretender right now?"  Detective Hensley testified at the suppression hearing that he knew "public pretender" meant an appointed attorney and that Jones was referring to an attorney.  Thereafter, Jones was asked if he recalled "telling the detectives that y'all can get me a public pretender right now," and Jones responded, "Yes.  Because we made a joke.  They made a joke right after that about it."  Jones then testified that by saying "public pretender" he meant a lawyer.

¶6     After listening to the testimony and to the audio recording of the detectives interrogating Jones, the circuit court denied Jones's motion to suppress, concluding that Jones's request was not unequivocal.  The circuit court found that Jones's reference to "a public pretender" was made "in sort of a joking manner," "with a question mark at the end," and that Jones and the two detectives laughed about the comment after it was made.  The court stated:  "Clearly, again to my ears, Mr. Jones and the detectives, all three of them were laughing at his comment about a public pretender.  It was thrust and parry.  It was not an unequivocal

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

4

Johnny Jerome Jones v. Reed Richardson,
No. 16-CV-712 (E.D. Wis.)
Case: 22-2064    Document: 10    Filed: 07/27/2022    Pages: 63

Exhibits to Habeas Answer
Page 208 of 992

request."  The court further noted Jones's experience in the criminal justice system and with being interrogated.

¶7    Subsequently, Jones pled guilty to homicide by negligent operation of a motor vehicle, hit and run resulting in death, and hit and run resulting in great bodily harm.  The circuit court sentenced Jones to ten years (five years of initial confinement and five years of extended supervision) for homicide by negligent operation of a motor vehicle, seven years (five years of initial confinement and two of years extended supervision) for hit and run resulting in death, and eight years (five years of initial confinement and three years of extended supervision) for hit and run resulting in great bodily harm, all to be served consecutively.

¶8    Jones appeals the circuit court's denial of his motion to suppress.

## DISCUSSION

¶9    Jones's argument before this court is two-fold.  First, he argues that the circuit court's factual findings following the suppression hearing are clearly erroneous; second, he contends that the record shows that he unequivocally invoked his right to counsel when he allegedly asked for a "public pretender."  Because we conclude that the circuit court's findings of fact are not clearly erroneous and because those facts demonstrate that Jones's statement regarding a "public pretender" was not an unequivocal request for counsel, we affirm.

**I.    The circuit court's factual findings are not clearly erroneous because they are supported by the audio recording of Jones's police interrogation.**

¶10    The circuit court found that during the police interrogation, Jones stated, "so y'all going to get a public pretender right now," in "sort of a joking manner," and then was "laughing at this comment" with the detectives.  Jones

5

No. 2014AP342-CR

contends that an examination of the audio recording in this case does not support the circuit court's findings. We disagree.

¶11 The circuit court's findings on a suppression motion must be upheld unless they are clearly erroneous. WIS. STAT. § 805.17(2). A finding is clearly erroneous if it is unsupported by evidence in the record. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530. Any conflicts in the evidence will be resolved in favor of the circuit court's ruling. *State v. Flynn*, 92 Wis. 2d 427, 437, 285 N.W.2d 710 (1979).

¶12 We have reviewed the audio recording submitted into evidence and conclude that it supports the circuit court's findings that Jones's reference to a "public pretender" was made in "sort of a joking manner," and that Jones was "laughing at this comment" with the detectives. Jones believes that the audio recording reveals that his "tone was non-descriptive" and that "it is not possible to tell from the recording who laughed—Mr. Jones or the officers." We disagree. A reasonable interpretation of the audio recording is that Jones made the statement with a joking tone—his reference to a "public pretender," rather than a "public defender," reveals as much. And laughter from three different individuals—two detectives and Jones—can be reasonably inferred from the recording. In short, the circuit court's findings are not clearly erroneous.[5]

---

[5] Jones also argues that the circuit court's finding that Jones said, "So y'all *going to* get a public pretender right now?," was erroneous. (Emphasis added.) However, as we previously explained, Jones and the State agree on appeal that Jones said, "So y'all *can* get a public pretender right now?" *See* supra fn.1; (emphasis added). As such, we accept the latter statement as true and need not examine whether the circuit court erroneously exercised its discretion in finding otherwise.

6

No. 2014AP342-CR

**II.    Jones's joking statement, "So y'all can get a public pretender right now?," was not an unequivocal request for counsel.**

¶13    Next, Jones argues that even if we conclude that the circuit court's findings of fact were not erroneous, the facts found by the circuit court do not support its conclusion that Jones's reference to a "public pretender" was not an unequivocal request for counsel.   Whether the facts found by the circuit court warrant suppression of Jones's statement is a question of law that we review *de novo*.  *See* ***State v. Drew***, 2007 WI App 213, ¶11, 305 Wis. 2d 641, 740 N.W.2d 404.

¶14    To invoke the Fifth Amendment right to counsel, a suspect is required to "'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"   *See* ***State v. Jennings***, 2002 WI 44, ¶30, 252 Wis. 2d 228, 647 N.W.2d 142 (quoting ***Davis v. United States***, 512 U.S. 452, 459 (1994)).  Such a request must be "unambiguous[ ]."   ***Davis***, 512 U.S. at 459.   A mere reference to an attorney is not sufficient to invoke the right.  *See* ***Jennings***, 252 Wis. 2d 228, ¶31.  For example, statements like, "'[m]aybe I should talk to a lawyer,' [are] not ... clear and unequivocal request[s] for counsel."   ***Id.*** (quoting ***Davis***, 512 U.S. at 462).   "'Unless [a] suspect *actually requests* an attorney, questioning may continue.'"   ***Id.*** (quoting ***Davis***, 512 U.S. at 461; emphasis added).

¶15    Here, Jones did not unequivocally request counsel.  The circuit court found that Jones's statement—"So y'all can get a public pretender right now"— was made "sort of with a question mark at the end of it, and he says it in a sort of a joking manner.  To my ears, he and the two detectives were laughing at this comment.  It was said in a tone that was, in my view, not particularly serious from

7

No. 2014AP342-CR

Mr. Jones." A joking reference to a "public pretender" is ambiguous by its very nature. The joking nature of Jones's statement—supported by the circuit court's finding that Jones's tone was "joking" and that Jones and the detectives laughed about the comment—as well as the content of Jones's statement—that is, his reference to a "public pretender," rather than a public defender—would not lead "'a reasonable police officer in the circumstances [to] understand the statement to be a request for an attorney.'" *See Jennings*, 252 Wis. 2d 228, ¶30 (citation omitted). We agree with the circuit court that Jones was "joking around with the officers" and that the statement "was part of the thrust and parry" between the detectives and Jones.

¶16    Our conclusion that Jones did not unequivocally request counsel is further supported by the fact that after police told Jones that they could not obtain counsel for him at that time because of the time of day, Jones asked the detectives, "How, how much, how much time is it anyway, you face off of reckless homicide?" It seems unlikely that Jones would voluntarily continue his conversation with the detectives without prompting if he had been sincerely requesting counsel.

¶17    At best, the tone and content of Jones's statement, "So y'all can get a public pretender right now?," as well as Jones's immediate question to police following their explanation that a public defender could not be obtained at that time of day, would only have led a reasonable officer to believe that Jones "*might* be invoking the right to counsel." *See Davis*, 512 U.S. at 459. But that is not enough to require the detectives to cease their questioning. *See id.* As such, we affirm.

8

Johnny Jerome Jones v. Reed Richardson,
No. 16-Cv-712 (E.D. Wis.)

Exhibits to Habeas Answer

Case: 22-2064     Document: 10     Filed: 07/27/2022     Pages: 212 of 992

No. 2014AP342-CR

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.

9

109

1    Supreme Court did in this *Jennings* case.

2                And Detective Hensley indicated by public

3    pretender that I knew he meant a lawyer, that's not the

4    analysis.  That's apples and oranges.  The question is,

5    is it an unequivocal request for a lawyer, not whether he

6    knew by the term "public pretender" that he is referring

7    to a public defender.  Yeah, he analyzed that just like

8    anybody looking at it would, but that's not the question.

9    The question is, is it an unequivocal request for an

10   attorney under the *Miranda* series of cases and it simply

11   is not and that's all I have.

12               **THE COURT**:  Thank you.

13               For the record, as indicated, I did review

14   the briefs that were submitted by both sides.  I also

15   reviewed the case law in Wisconsin including the *Jennings*

16   case.  Beyond that I reviewed the *Markwardt* decision,

17   along with the *Fischer* case.

18               I will note, first of all, that in the

19   argument presented by both sides, there's a disagreement

20   between the State and the defense as to what was exactly

21   said.  And it's important in the Court's analysis

22   because, beyond reading the Wisconsin cases, I spent a

23   bit of time yesterday, had a law clerk assist me with

24   some additional research on some cases at the federal

25   level that also discuss the request for an attorney and

-7-

```
 1    whether or not a defendant's statement or request for

 2    counsel is unequivocal.

 3            And I think it is important in my analysis

 4    to put this in context and to be very careful about

 5    exactly what was said by the defendant.  The defense

 6    argues that Mr. Jones said, "y'all can get me a public

 7    pretender now".  The State argues that the defendant said

 8    "so y'all going to get a public pretender right now."

 9            And there is a difference.  I've listened to

10    that portion of the CD at least half-a-dozen times.  The

11    defendant clearly says "so y'all going to get a public

12    pretender right now."  He does not say, "you all can get

13    me a public defender now."  And he says it clearly in

14    what I interpret to be effectively a joking tone.

15            To my ears, and I listened to the CD many

16    times, he makes the comment, so y'all going to get a

17    public pretender right now, sort of with a question mark

18    at the end of it, and he says it in a sort of a joking

19    manner.  To my ears, he and the two detectives were

20    laughing at this comment.  It was said in a tone that

21    was, in my view, not particularly serious from Mr. Jones.

22    It was answered by the detective as pretty much along the

23    lines you said it right "pretender", with a very short

24    pause, they are called public defenders.  And the

25    defendant says, oh, yeah, or something to that effect.
```

-8-

1        The detective says due to the time right

2    now, we can't pause this for a short period of time.  The

3    defendant then continues and asks the question of how

4    much time can I get for this any ways; how much do I face

5    for this homicide.  The detective then goes on and says

6    he believes it's 15 years but don't quote me on that and

7    it goes on from there.

8        Very shortly before the comment about a

9    public pretender was made, the defendant was read his

10   rights; he understood them; he waived them, and,

11   approximately, a minute earlier, maybe less than that, he

12   says he was willing to answer questions and something to

13   the effect of I want to -- I want to real bad.  In other

14   words, he allegedly wanted to answer the questions badly.

15       I had the law clerk do a little research on

16   the issue of public pretender.  She could not find or

17   could I in a case that discusses that slang term or that

18   joking term or that derogatory term, which is used

19   commonly by some defendants, by some people that are

20   being charged in the criminal justice system,

21   occasionally by people that are being interrogated.  And

22   I do believe that the detective knew that public

23   pretender meant public defender.

24       Mr. Jones is someone who, frankly, does have

25   experience in the criminal justice system.  This was not

-9-

1    the first time he had been involved in the criminal

2    justice system.  It appears it was certainly not the

3    first time he was being interrogated.  And, in my view,

4    he was specifically along the lines of what the State

5    argued as part of the "thrust and parry" between the

6    detectives and the defendant using his term; a slang,

7    derogatory, joking fashion.  It was meant to be used in a

8    slang fashion.  It was meant to be derogatory.  It was

9    meant to be insulting to the capabilities or lack thereof

10   of public defenders.

11              And the analysis of what he said is also

12   important because, in looking at the Wisconsin decisions

13   and some federal cases, the State is correct.  Obviously,

14   the long line of cases, both at the federal level and the

15   Wisconsin courts after the *Miranda* decision, make it

16   clear that the defendant, as someone being interrogated

17   as Mr. Jones was, needs to make his request in

18   unequivocal fashion.  He needs to articulate his request

19   for an attorney clearly.

20              There's a line of cases that are cited in

21   *U.S. v. Peters* which is in the 7th Circuit 2006, where

22   they quote a whole line of cases and indicate the nature

23   of so-called requests that are not clear; requests that

24   are equivocal, requests that are not unequivocal,

25   statements that do not rise to the level of the

-10-

```
 1    unequivocal requests.  And those include comments like
 2    maybe I should talk to a lawyer; that was held to be
 3    ambiguous.  Comments like I might want to talk to an
 4    attorney could be ambiguous.  The question along the
 5    lines do you think I need a lawyer could be ambiguous.
 6    Comments like I'm not sure if I should say anything or I
 7    may need somebody I can talk to have all been held
 8    ambiguous rather than a clear assertion of the right to
 9    remain silent, rather than a clear invocation of the
10    defendant's request for an attorney.
11             Both sides cited accurately that under the
12    circumstances when this issue arises on the request for
13    an attorney or the invocation of one's right to counsel,
14    as both sides indicated, does not have to be articulated
15    in any specific language; does not have to be overly
16    formal.  But it does have to be clear to a police officer
17    who, under the circumstances, would understand that
18    statement was an invocation of the right to remain
19    silent.
20             And it's also clear that if the suspect, if
21    the person in Mr. Jones' situation, does not
22    unambiguously invoke his right to counsel, his right to
23    remain silent, the police do not need to cease their
24    questioning of the suspect and, obviously, they did not
25    cease their questioning in this case.
```

-11-

```
 1              The bottom line is I do not believe this was

 2      an unequivocal request under the circumstances.  I think

 3      that this defendant, Mr. Jones, was joking around with

 4      the officers.  He and they laughed to my ears at his

 5      derogatory, slang phrase, this insulting phrase about

 6      public defenders.  I think this was a situation where he

 7      was, if there was any request, whatsoever, I'm not sure

 8      that there was, it was very equivocal.  It was certainly

 9      not an unequivocal request.  It was part of the thrust

10      and parry, which is indicated by the context and the

11      circumstances, including that very, very shortly before

12      this comment, which beyond what I've said already, was

13      said in almost a rhetorical kind of odd fashion.

14              Clearly, again to my ears, Mr. Jones and the

15      detectives, all three of them were laughing at his

16      comment about a public pretender.  It was thrust and

17      parry.  It was not an unequivocal request.

18              The State has met their burden in this case.

19      The motion to suppress the statement is denied on this

20      ground and on the grounds that we dealt with last week.

21      Based on that, I presume we're going forward to trial.

22      The trial is in ten days.

23              Is there anything else we need to discuss

24      before we calendar accordingly, gentlemen?

25              **MR. STINGL:**  Two things from the State.  One
```

-12-

```
 1                    MR. JENSEN:  No, sir.

 2                    THE COURT:  Received.

 3                    THE WITNESS:  James Hensley; J-a-m-e-s,

 4          H-e-n-s-l-e-y.

 5                       DIRECT EXAMINATION

 6     BY MR. STINGL:

 7          Q     Detective Hensley, who is your employer?

 8          A     The city of Milwaukee Police Department.

 9          Q     You're a police detective?

10          A     I am.

11          Q     What is your current assignment?

12          A     I am assigned to the metropolitan division,

13     late-shift homicide unit.

14          Q     What is the homicide unit?

15          A     Our primary job is to investigate homicides and

16     any critical incidents that happened in the city of

17     Milwaukee.

18          Q     How long have you been in the homicide unit?

19          A     Approximately, six years.

20          Q     How long have you been a detective?

21          A     About eight-and-a-half years.

22          Q     Prior to that were you a uniform officer?

23          A     Yes.

24          Q     So how long altogether have you been with the

25     Milwaukee Police Department?
```

-5-

1      A    About 15-and-a-half years.

2      Q    In terms of a police officer and becoming a

3    police detective, did you receive any specialized training

4    in the area of the interrogation of persons who are in

5    custody?

6      A    Yes.

7      Q    What type of training did you personally receive?

8      A    I went to a four-day seminar on the Ried

9    interview technique.  I also went to a one-day seminar held

10   in Madison.  There was also some training regarding

11   interviews during detective -- or new detective training

12   once I was promoted.

13     Q    And, in terms of your promotion to detective, was

14   that the first training you received regarding

15   interrogation of persons in custody or did you receive some

16   as a police officer?

17     A    Yes.  Well, in the academy, they gave us a basic

18   training for interviewing in custody.

19     Q    And that was the academy of training to become a

20   police officer?

21     A    Yes.

22     Q    And, again, as the detective you received

23   training regarding your promotion to detective in that

24   area?

25     A    Yes.

-6-

1     Q     And the seminars that you discussed, did that

2   occur after you became a detective, the Ried training, the

3   four-day training and the other one-day training?

4     A     Yes.

5     Q     And did all of that occur prior to January 18th

6   of 2010?

7     A     Yes, it did.

8     Q     Now, in terms of such interviews, how many

9   interviews as a detective have you conducted regarding

10   persons who are in custody?

11     A     It's hard to put a number on that, certainly

12   hundreds, several hundred.

13     Q     And, in terms of your role as a homicide

14   detective, is that a standard part of your activities in

15   investigating homicides?

16     A     Yes, it is.

17     Q     In terms of how often you perform such interviews

18   on a weekly basis, when you're on duty as a homicide

19   detective, what would you state in terms of how often that

20   occurs?

21     A     It's pretty hard to put it in that category as

22   far as weekly.  Because, obviously, based on when a suspect

23   is brought into custody, we may go for a week or two

24   without talking to anyone.  But then we may go, you know,

25   the following week we may talk to four, five people in a

-7-

1    matter of two or three days.  So I guess if you had to

2    probably throw a number at it, I would say twice a week

3    would probably be a good number.

4         Q    Did you have an opportunity to become involved in

5    interviewing a person by the name of Johnny J. Jones on or

6    about January 18th of 2010?

7         A    Yes.

8         Q    Did you have a partner during that interview?

9         A    I did.  Detective David Chavez.

10        Q    And he is also a member of the homicide unit?

11        A    He is.

12        Q    And that involved an incident which occurred on

13   Thursday, December 31st, 2009 in the area of 4300 West

14   Center Street?

15        A    Yes.

16        Q    Is that address in the city and county of

17   Milwaukee?

18        A    It is.

19        Q    And, just so we're speaking of the same

20   investigation that involved the death of Shanica Adkins and

21   injuries to a Donta Brown?

22        A    Yes.

23        Q    Now, was the Johnny Jones or is the Johnny Jones

24   that you interviewed on that day January 18th, 2010 present

25   here in court?

-8-

1       A    Yes, he is.

2       Q    Could you, please, point him out and tell us what

3    he's wearing?

4       A    He's seated at the defense table with an orange

5    shirt over a gray shirt.

6            **MR. STINGL:**  I ask the record to reflect

7       that he's identified Johnny Jones.

8            **THE COURT:**  So ordered.

9    **BY MR. STINGL:**

10      Q    Where did this interview occur?

11      A    It took place in the Police Administration

12   Building.  I forgot which interview room.

13      Q    If the report related to State's room 418, would

14   that be correct?

15      A    Yes.

16      Q    And what is 418?  Can you describe that?

17      A    It's typical police department interview.  It's,

18   roughly, eight feet square.  It's painted white.  There's a

19   table and in this case three chairs, one for the individual

20   being interrogated and then one for my partner and I.

21      Q    You say there's a table, as well?

22      A    Yes.

23      Q    And the person interviewing Johnny Jones is that

24   person here in court?

25      A    Yes.

-9-

```
1       Q    And was he, in anyway, handcuffed or restrained

2   in any manner during this interview?

3       A    No.

4       Q    Did you or Detective David Chavez advise him of

5   his Miranda rights?

6       A    Yes, we did.

7       Q    And who did that?

8       A    Detective Chavez.

9       Q    Was this interview audio recorded?

10       A    Yes, it was.

11       Q    And did that include the Miranda rights?

12       A    Yes.

13       Q    Do you recall what time this interview commenced?

14       A    I believe it was 1:18 a.m.

15       Q    And how long did it last?

16       A    About an hour and 45 minutes.

17       Q    Now, is it the practice and in your experience of

18   working with Detective Chavez, does he read the rights off

19   the constitutional right's card?

20       A    Yes, we always do.

21       Q    I'm showing you what's been marked as Exhibit 3.

22   Can you identify that?

23       A    It's a State of Wisconsin Miranda warnings card.

24       Q    It's actually a copy of that card; is that

25   correct?
```

-10-

121

```
1      A    Yes.

2      Q    And is that the card -- copy of the card that

3   you're speaking of?

4      A    Yes, it is.

5      Q    Now, during the interview of Johnny Jones on

6   January 18th of 2010, did you and Detective Chavez ask him

7   any questions about whether he was under the influence of

8   anything?

9      A    Yes.

10     Q    And why did you do that?

11     A    We do it with every interrogation that we

12  conduct.

13     Q    And, in terms of this particular interrogation,

14  did you ask him whether -- in terms of responses to that

15  question, what did the defendant say?

16     A    He was not on any type of drugs or had not been

17  drinking any alcohol.

18     Q    I guess, more importantly, you made observations

19  of him during this particular interview, correct?

20     A    Yes.

21     Q    And one of the things that you look for is

22  whether he appears to understand what's going on?

23     A    Correct.

24     Q    Whether he can -- or let me ask this.  Did he

25  appear to understand what was going on?
```

-11-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)

Exhibits to Habeas Answer

Case 2:22-cv-20004    Document: 10    Filed: 07/27/2022    Page: 352 of 992

```
 1       A    Yes.

 2       Q    Did he leave any doubt in your mind, any concern

 3   at all whether he was able to understand what you were

 4   talking about during this interview?

 5       A    No.

 6       Q    Did he make appropriate responses to questions

 7   that you asked?

 8       A    Yes, very.

 9       Q    Did he ask questions of you?

10       A    Yes.

11       Q    And, in fact, one of those questions, for

12   instance, was about how much time he might face for this?

13       A    Correct.

14       Q    And Detective Chavez answered that as best that

15   he could?

16       A    Correct.

17            MR. JENSEN:  Objection.  Leading.

18            THE COURT:  Overruled.

19            MR. STINGL:  And I would just state for the

20       record that this is -- I'm almost done.  It's abbreviated

21       questioning because I think that the tape speaks for

22       themselves and are part of a record.

23            THE COURT:  I agree with that.  Having heard

24       the DVDs, I would expect the testimony to be abbreviated.

25       I've listened to every minute of these two DVDs.
```

-12-

1          MR. STINGL:  And with that, I have no

2     further questions.

3          THE COURT:  Cross.

4               CROSS-EXAMINATION

5     BY MR. JENSEN:

6          Q     Detective, the interview began at 1:18 a.m., you

7     say, right?

8          A     Yes.

9          Q     And how did Mr. Jones come into custody, if you

10    know?

11         A     I'm not sure.

12         Q     So if Mr. Jones testified that he turned himself

13    in, you would have nothing to dispute that, right?

14         A     Correct.

15         Q     Do you know how long he had been in custody

16    before 1:18 a.m. on January 18th, 2010?

17         A     No.

18         Q     Now, you testified that you asked Mr. Jones

19    whether he was under the influence of drugs or alcohol,

20    correct?

21         A     Yes.

22         Q     But when you asked him that, the context of the

23    question was whether he was under the influence at the time

24    of the accident, correct?

25         A     Actually, we asked him both at the time of the

                          -13-

```
1    accident.  At one point during the interview if he was

2    drinking or any -- had been using any drugs at the time of

3    the accident.  But beginning at the end of what we call a

4    "pedigree form", we asked currently and I believe the words

5    we typically use are in the last 24 to 48 hours.

6        Q    And although the tape speaks for itself, what is

7    your recollection of Mr. Jones' response?

8        A    That he had not been drinking or taking any

9    drugs.

10       Q    Did you examine Mr. Jones' ability to balance;

11   for example, did you run any field sobriety tests on him?

12       A    No.

13       Q    Could you smell alcohol on his breath?

14       A    No.

15       Q    Did he appear to be slurring his words?

16       A    No.

17       Q    Now, you testified that Mr. Jones at one point

18   asked what was the maximum amount of time that he could get

19   for the case he was being questioned about, correct?

20       A    Yes.

21       Q    What was the answer that was given to him?

22       A    I believe it was like 15-year maximum, words to

23   that effect.

24       Q    And that turned out not to be true, right?

25       A    What's that?
```

-14-

1    Q    That the case he's charged with facing does not

2    carry a maximum of 15 years, does it?

3    A    Actually, I don't know.

4    Q    At some point Mr. Jones told you that he wanted

5    to have an attorney, correct?

6    A    No.

7    Q    Well, at 29:10 on the recording, he said "y'all

8    can get me a public pretender now", right?

9    A    Yes.

10    Q    You knew or know that a "public pretender" is an

11    appointed attorney, correct?

12    A    Yes.

13    Q    In fact, you knew that because you told him there

14    wasn't time for him to get a lawyer right now, correct?

15    A    Not in those words, but words to that effect at

16    this time of night.

17    Q    So you knew Mr. Jones was talking about a lawyer,

18    didn't you?

19    A    Yes.

20    Q    And did you stop the interview at that point?

21    A    We weren't questioning him.

22    Q    All right.  But the interview didn't stop?

23    A    Correct.

24    Q    How long did it continue after he said that?

25    A    About an hour, maybe.

                              -15-

1      Q      And if you weren't questioning him, what went on

2    for that hour?

3      A      My answer when I said we weren't questioning

4    him -- we weren't questioning him when he said that when he

5    asked about a pretender.

6      Q      But you did continue to question him after he

7    said he wanted a public pretender, correct?

8                **MR. STINGL:**  I'm going to object to the

9    characterization of that "he wanted".  That's not what he

10    said.

11                **THE COURT:**  Right.  I don't think that's

12    what he said.  I have it in my notes.  It was certainly

13    not that clear.

14                Sustained.

15                **MR. JENSEN:**  I'll rephrase the question.

16    **BY MR. JENSEN:**

17      Q      You continued to question him after he said y'all

18    can get me a public pretender now?

19      A      Yes.

20      Q      Did Mr. Jones have the opportunity to speak to a

21    lawyer before you continued with your questioning?

22      A      No.

23      Q      How did the questioning end; how did the

24    interview end?

25      A      As far as what?

-16-

127

1    Q    Well, at some point you stopped interviewing Mr.

2    Jones, correct?

3    A    Yes.

4    Q    Why did you stop interviewing him?

5    A    I don't recall.

6    Q    After you stopped interviewing him, where did he

7    go, if you know?

8    A    Back to the prison processing section.

9    Q    Do you know once he was taken back there, was he

10   given access to an attorney?

11   A    No.

12   Q    You don't know or he was not?

13   A    Sorry.  Yes, I know.  No, he was not.

14   Q    Do you know whether or not Mr. Jones was taken to

15   the hospital after your interview?

16   A    I do not.

17        **MR. JENSEN:**  No further questions.

18        **THE COURT:**  Follow-up.

19             REDIRECT EXAMINATION

20   **BY MR. STINGL:**

21   Q    I'm showing you what's been marked as Exhibit 4.

22   Can you identify that?

23   A    This is a copy of the arrest and detention report

24   for Mr. Jones.

25   Q    And is that arrest detention report a document

-17-

```
 1    which you relied upon in your business as a Milwaukee

 2    police detective?

 3         A    Yes.

 4         Q    Now, that particular document relates to the

 5    arrest of Johnny Jones?

 6         A    Yes, it does.

 7         Q    And that's the person here in court?

 8         A    Yes.

 9         Q    What was the time, date of the arrest?

10         A    It was on January 17th, 2010 at six o'clock p.m.

11              MR. STINGL:  Thank you.

12              I move to introduce Exhibit 4 into evidence.

13              MR. JENSEN:  No objection.

14              THE COURT:  Received.

15              MR. STINGL:  I have no further questions.

16              THE COURT:  Any follow up?

17              MR. JENSEN:  I have no cross on that.

18              THE COURT:  You can step down, Detective.

19              Thank you.

20              MR. STINGL:  State calls Detective Charles

21    Mueller.

22              THE COURT:  Fine.

23              MR. STINGL:  I would move Exhibit 3 into

24    evidence.

25              THE COURT:  Any objection?
```

-18-

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  You discussed whether to testify

3    or not with your attorney; is that right?

4          THE DEFENDANT:  Yes, I have.

5          THE COURT:  Fine.

6          He can proceed.  He's testifying freely and

7    voluntarily, as far as I can tell.

8                    DIRECT EXAMINATION

9    BY MR. JENSEN:

10     Q    Mr. Jones, you're the defendant in this case; is

11   that right?

12     A    Yes.

13     Q    And how did you come into police custody?

14     A    I turned myself in.

15     Q    Describe for the Judge what you did that you

16   characterize as turning yourself in?

17     A    The officer was out the car by my mother's house.

18   I called my mother, and my momma told me to turn myself in.

19   So me and her had a discussion.  So she gave me the

20   telephone number to call.  I called the guy.  I told -- he

21   tried to ask me questions about the case.  I told him,

22   like, I'm trying to get a lawyer before I sign myself in.

23   He told me alright.  I told him to meet him over there on

24   7th and Locust or 6th and Locust.  It was a corner store.

25   I told him meet me.  He met me over there at 6 o'clock.

-31-

```
1       Q    On what day?

2       A    18th of January, 17th of January.

3       Q    Does your mother live in Milwaukee?

4       A    Yes.

5       Q    What's your mother's address?

6       A    2741 South 14th Street.

7       Q    Did you meet the officer at the corner store?

8       A    Yes.

9       Q    What happened then?

10      A    We drove.  I got in the back of the car.  He

11  didn't handcuff me.  I just got in the back of the car, and

12  he took me to the police station.

13      Q    When did this phone call with Detective Devon

14  with reference to when you met him at the corner store?

15      A    Maybe, about a hour or two prior.

16      Q    Did you make any efforts to retain an attorney

17  before you turned yourself in?

18      A    I tried.  I was calling my -- I was calling

19  around to my people to try to get me an attorney, but

20  nobody had no money or nothing like that.  So I said I'm

21  just going to turn myself in.

22      Q    Prior to turning yourself in, and let's limit

23  this to the two or three hours before you turn yourself in,

24  had you consumed any alcohol or drugs at any time?

25      A    Yeah.  I went -- I went to -- I went and got a
```

-32-

```
1    couple of ecstasy pills.  I took those and I had like two,
2    three shots of Patron.
3         Q    What is Patron?
4         A    It's Tequila.
5         Q    Why did you do that if you knew you were turning
6    yourself into the police?
7         A    Because I ain't want to go down there sober.  I
8    ain't want to face -- I would rather been under the
9    influence.  I didn't want to go deal with what I was
10   facing.
11        Q    What time was this that you took the two ecstasy
12   pills?
13        A    Maybe like 5, 5:30, 5 o'clock, something like
14   that.
15        Q    By the time you met with the officer at the
16   corner store, were you feeling the affects of the ecstasy
17   pills?
18        A    They started to kick in probably be about six
19   o'clock, as soon as I got down to the station.
20        Q    Describe for the Judge how ecstasy pills affected
21   you; how they affected you?
22        A    It depends on the mood that you in.  It depends
23   like in an instant the mood that you in.  So at the time I
24   was really emotional.  So I was just emotional, very --
25   like I can't describe it.  I was just like over the top
```

-33-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)

Exhibits to Habeas Answer

Case 2:22-cv-2064   Document: 10   Filed: 07/27/2022   Page: 374 of 992

1    with it.

2        Q    How long do the affects of ecstasy last in you?

3        A    It could last about a day.

4        Q    All right.  After you were arrested, where did

5    you go?

6        A    They put me inside a cell.

7        Q    At what police station?

8        A    I don't know.

9        Q    How long were you in the cell?

10       A    I don't know.  With the drugs and then no clock

11   and nothing around, I couldn't tell.

12       Q    How long after you were arrested did you begin

13   your first interview?

14       A    I don't know.  I don't know.  I don't remember.

15       Q    Were you under the influence of the ecstasy

16   during the first interview?

17            MR. STINGL:  I'm going to object at this

18       time phrased "under the influence".  That is vague.  It

19       doesn't mean anything.

20            MR. JENSEN:  All right.  I'll rephrase the

21       question.

22   BY MR. JENSEN:

23       Q    Were you feeling the effects of the ecstasy at

24   the time you began your first interview?

25       A    Yes.

                          -34-

```
 1       Q    Describe what those affects were; how were you

 2   feeling?

 3       A    Like, I was -- I was going through a thing where

 4   I was already behind this woman getting killed.  So -- so

 5   -- so my emotions was going like 10 times like that.  So my

 6   palms were sweaty.  My heart beating real fast, but I know

 7   like I have to get through the interview.

 8       Q    Did you tell the police that you were under the

 9   influence of ecstasy or that you had taken ecstasy?

10       A    I don't remember.

11       Q    Do you remember whether they asked you if you had

12   consumed any drugs or alcohol before the interview?

13       A    I don't remember.

14       Q    Did you ask the police what was the maximum

15   penalty you were facing?

16       A    Yeah.  I asked.  I asked the detective.  I

17   said -- I asked him what I'm being charged with.  He told

18   me I'm getting charged with -- telling me I was getting

19   charged with second-degree reckless homicide.  So I'm

20   thinking like -- so I'm thinking like, okay, second-degree

21   homicide because I just did 10 years.  And I was facing 215

22   years.  So they gave me 15 years that I was facing.  So now

23   I'm facing like 10.  So I would be facing 10.  But for a

24   stay sentence then, he was facing another 10 for his own --

25   for him being on parole.  So him facing another 15.  He's
```

-35-

1    going to get band.  So I'm like, alright, 15 years for me

2    at the most.  If this the most I can get, I might as well.

3    I'm pretty sure 10.  They mess around and give me like two

4    or three years so why wouldn't I.

5         Q    So, first of all, who is Sean?

6         A    Sean Moore, that was a guy I met in jail.

7         Q    And, second of all, why did it matter to you

8    during this interview what time Sean was facing?

9         A    Because prior to this -- prior to me turning

10   myself in, me and Sean girlfriend was talking.  We kept on

11   talking about me taking the case for Sean.

12        Q    Who was driving the car that night at the time of

13   the accident?

14        A    Sean, Sean was.

15        Q    Sean Moore?

16        A    Prior to -- prior to -- prior to the incident, we

17   was -- I was driving.

18        Q    Listen to my question.  At the time of the

19   collision, who was driving the car?

20        A    Sean was.

21        Q    Now, what did the detectives tell you the maximum

22   penalty was again?

23        A    Fifteen years.

24        Q    Now, why did that -- tell me again why that made

25   a difference to you?

-36-

Johnny Jerome Jones v. Reed Richardson,          Exhibits to Habeas Answer
No. 16-C-712 (E.D. Wis.)          Document: 10          Filed: 07/27/2022          Page 38 of 63

Case 2:22-2064          Document: 10          Filed: 07/27/2022          Pages: 877 of 992

```
 1        A    Because I'm feeling like -- I'm feeling like --

 2   the detective, the way he's saying it like that's the most

 3   I can get is 15 years.  I don't know if it was word play

 4   that he was trying to do.  But I asked him, like, okay, is

 5   it second-degree reckless.  That's 15 years.  Okay, so I

 6   will get 15 years.  I end up facing like 65.  You know what

 7   I'm saying?  So I'm thinking 15 years, I can cool it like

 8   two or three years.

 9        Q    Alright.  Do you recall telling the detectives

10   that y'all can get me a public pretender now?

11        A    Yes.  Because we made a joke.  They made a joke

12   right after that about it.

13        Q    Well, what do you mean when you told them you

14   could get me a public pretender right now?

15        A    For them -- for them to get me a lawyer right

16   there because prior to this I've been trying to get a

17   lawyer.

18        Q    So did you get a lawyer at that point?

19        A    No.

20        Q    Why did you continue with the interview then?

21        A    Because -- because -- because -- I'm thinking

22   like -- like -- like -- like might as well, might as well

23   go ahead and take the wrap for Sean.  I was still going to

24   take the wrap for Sean, though.

25        Q    Alright.  After that interview ended, what
```

-37-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)
Case: 22-2064    Document: 10    Filed: 07/27/2022    Page: 378 of 992

Exhibits to Habeas Answer
Page 68

```
1   happened?

2        A    After that interview, the first one?

3        Q    Yes?

4        A    They took me back up to my cell.

5        Q    What happen then?

6        A    I'm up in the cell.  I get to sweating.  I get to

7   sweating like crazy.  I feel like -- I feel like the pills

8   has tingling all over me.  So my heart start beating real

9   fast, and I got real scared.

10       Q    What did you do?

11       A    I told the police, well, I think I'm going to

12  die.  And they called the ambulance, and they take me to

13  the hospital.

14       Q    What happened at the hospital?

15       A    They -- they -- they -- they checked my vitals

16  and stuff.  And by then -- by then my heart rate got back

17  to normal and stuff so -- so I don't know.

18       Q    Did you tell the doctors at the hospital, any of

19  the hospital personnel that you were under the influence of

20  ecstasy?

21       A    No.

22       Q    Why not?

23       A    I didn't want -- I didn't want to get in trouble.

24  I didn't want to get in trouble for taking -- I ain't -- I

25  don't know.
```

-38-

```
1       Q    Alright.  Have you ever had a panic attack like
2   that before?
3       A    No.
4       Q    How long were you at the hospital?
5       A    I don't know, maybe a couple hours.
6       Q    From the time the first interview ended until the
7   time the second interview began, did you consult with an
8   attorney?
9       A    No, sir.
10      Q    Were you offered the opportunity to consult with
11  an attorney by any person?
12      A    I don't recollect.
13      Q    When the second interview began, were you still
14  feeling the affects of the ecstasy?
15      A    I was.  I was but it wasn't as deep as when I was
16  at first.
17      Q    So why did you continue with the second interview
18  after you had already asked for a lawyer?
19           MR. STINGL:  I'm going to object at this
20      time the phrasing "he asked for a lawyer" because he did
21      not, and that's the State's position.  The tape speaks
22      for itself, the recording.
23           MR. JENSEN:  Well, it doesn't assume a fact
24      not in evidence, but I'll rephrase the question.
25           THE COURT:  Fine.  It can be rephrased.
```

-39-

```
 1    Certainly that's not the language Mr. Jones used, if at
 2    all.  There was a discussion about a public pretender.
 3    He never once said he wanted an attorney.
 4    BY MR. JENSEN:
 5         Q    After you told the police y'all can get me a
 6    public pretender right now, why did you decide to continue
 7    with the second interview?
 8              MR. STINGL:  I'm going to object to the
 9    phrasing that he told the police that.  That was a
10    question, and it was answered, no, that they can't get
11    him right now.  So he's putting words in his client's
12    mouth regarding that he asked for an attorney; that he
13    told the police he wants an attorney.  That is not true.
14              THE COURT:  Why don't we just make it after
15    the words "public pretender" came up, whether it was a
16    request or a suggestion or however, why did he then go
17    forward with the second interview.
18              MR. STINGL:  And unless this goes to the
19    Goodchild issue, which is the only issue raised in the
20    defendant's motion, it's not relevant because I have the
21    motion in front of me.  Unless there's another motion --
22    and the issue of the right to have an attorney is not
23    mentioned in that motion.  The State has no notice of
24    that issue, and it is waived by the defense at this time.
25              So I'm surprised by the fact that he keeps
```

-40-

```
 1     asking about that particular phrase, which is in the

 2     police reports and in the recordings.  It's in Detective

 3     Chavez's police report that phrase, and it's not raised

 4     in the motion.

 5          MR. JENSEN:  I don't believe that's an issue

 6     that can be raised.  I don't think there's any

 7     requirement in the statutes that there even be a written

 8     motion.  I filed a written motion to have a hearing ahead

 9     of time, and that issue is in play.  And if the State is

10     surprised, then I guess we need to have an adjournment so

11     that they can be prepared to address that issue.  I don't

12     know what additional information they would have other

13     than the recording and the detectives who were there.

14     But if Mr. Stingl needs an adjournment, I think he should

15     be granted one because that is an issue, and it has not

16     been waived.

17          THE COURT:  Well, in the motion to suppress,

18     the defense raises the allegation that the defendant took

19     three or four ecstasy pills.  He was allegedly ill.  And

20     during the interrogation, the police allegedly told him

21     that the most "he could get" was 15 years.

22          There's not a mention of him being denied a

23     right to an attorney.  There's not anything in there, in

24     the written motion that that ever came up.

25          MR. JENSEN:  And I agree with that, and
```

-41-

1    we're not at the end of the case yet.  And if we were

2    talking about a post-conviction motion, there may be an

3    issue of waiver.  But we're pretrial.  It's an issue that

4    has developed.  Maybe I should have been more -- maybe I

5    should have raised it in the written motion.  But it is

6    not permanently waived by any stretch.  We're pretrial

7    now.  And if Mr. Stingl is surprised and he has some

8    evidence that he hasn't presented, then I guess he should

9    be given the opportunity to present the evidence.

10             **MR. STINGL:**  It's not so much evidence,

11    Judge.  If the Court is going to consider that issue,

12    then I want to brief the issue, and it won't take me a

13    long time to do it.  It might take a couple of days.  But

14    I was notified of these issues.  We did research

15    regarding these issues.  I was prepared to inform the

16    Court of the case law regarding these issues, and not in

17    terms of what he is stating now whether this is a request

18    for an attorney, which I know there's specific case law

19    on that issue.

20             And if the Court is going to consider it, I

21    would ask just for an opportunity to brief that issue

22    because I am surprised.  I prepare for a motion that's

23    before me.  The rules regarding motions is that they must

24    state the issues with specificity.  He has done so.  And

25    I appreciate the concise nature of it right to the point,

-42-

1    and that's what we prepared for.

2              MR. JENSEN:  Right.  There's also a local

3    rule that prohibits ad hoc legal arguments, and I haven't

4    received any written response from the State.  So if Mr.

5    Stingl was prepared with all his case law, I would have

6    objected to him rattling it off orally here today.  So it

7    looks like we need post-hearing briefs anyway.

8              MR. STINGL:  That's right.  I don't believe

9    in briefing something before we have a hearing on it.

10             MR. JENSEN:  Fine.  Then I think we're all

11   on the same page.  We'll submit post-hearing briefs.

12             THE COURT:  Fine.  Why don't we continue,

13   continue where we left off.  We can deal with the issues

14   that were raised in the motion to suppress and the

15   alleged use of ecstasy pills, the alleged illness, and

16   any affect it may have had on Mr. Jones.  And we can come

17   back to, if necessary, with briefs, which, I mean, from

18   the Court's standpoint, I mean, candidly, I was somewhat

19   surprised when I was listening to the CD yesterday and

20   heard this little -- I don't even know that I would

21   characterize it as a conversation, but the words "public

22   pretender", not "public defender", but "public pretender"

23   came up about the 29-minute mark on the first CD.  The

24   defendant and whichever officer was interrogating him at

25   that point in time joke about it; have a conversation for

-43-

```
 1    about 15 or 20 seconds, and then they continue forward.

 2                So let's continue, and then we'll decide at

 3    the end of today's hearing if we need additional time on

 4    that issue.

 5                Go ahead, counsel.

 6  BY MR. JENSEN:

 7    Q    My question, Mr. Jones, was, and I'll read from

 8    the report now so that I don't draw an objection.  After

 9    you told the officer at 00:29:10 "so y'all can get a public

10    pretender right now", why did you continue with the second

11    interview?

12    A    I basically kept going because I felt that -- I

13    felt that -- that I was doing the right thing for my

14    friend.  Period.

15                MR. JENSEN:  I have no further questions.

16                THE COURT:  Cross.

17                        CROSS-EXAMINATION

18  BY MR. STINGL:

19    Q    How many times have you been arrested?

20                MR. JENSEN:  I'll object to the -- well, I

21    won't object to that question.

22                THE COURT:  Fine.

23                You can answer, Mr. Jones, please.

24                THE DEFENDANT:  Twice.  I don't -- I

25    don't -- I don't -- like drive and stuff like that?
```

-44-

143

```
 1                    THE COURT:   The question is arrested, not
 2       convicted, not charged.   Arrested.
 3                    THE WITNESS:   Maybe, like, about five times,
 4       I think.   I don't -- I don't know.
 5       BY MR. STINGL:
 6            Q    You've been to prison?
 7            A    Yes.
 8            Q    What was that for?
 9            A    For robbery, threat of force.
10            Q    And during that case, were you questioned by
11       police?
12            A    Yes.
13            Q    That was from 1998?
14            A    Yes.
15            Q    Did you make -- did you understand when you were
16       being questioned by police what that questioning was about
17       in that case?
18            A    I wasn't questioned by the police.
19            Q    Okay.   My question was in that case were you
20       questioned by the police?
21            A    Was I?
22            Q    Yes?
23            A    They asked me and I didn't give a statement.
24            Q    So you understood your rights?
25            A    Yes.
```

-45-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)
Case 22-2064    Document: 10    Filed: 07/27/2022    Page 386 of 992

Exhibits to Habeas Answer

1      Q    And you have other convictions as well, correct?

2      A    I have one other conviction.

3      Q    1998 obstructing, correct?

4      A    Obstructing?

5      Q    I'm going to stop because, obviously, you don't

6   even know your own criminal record.  Is that true or do you

7   want me to show it to you?

8      A    Yeah.

9      Q    You have a pending case in Kenosha County for

10  having felon in possession of a firearm, correct?

11     A    Correct.

12     Q    Were you questioned in that case?

13     A    No.

14     Q    Now, let me ask you, you remember and you

15  testified specifically about the detectives questioning you

16  in this case, correct?

17     A    Correct.

18     Q    You remember that?

19     A    I remember them questioning me?

20     Q    Yes?

21     A    Yeah.

22     Q    And you remember what they questioned you about?

23     A    Sort of, kind of.

24     Q    Sort of, kind of?  What don't you remember about

25  it?

-46-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)

Exhibits to Habeas Answer

Case 2:22-cv-2064    Document: 10    Filed: 07/27/2022    Page 687 of 992

1      A    I mean ---

2      Q    You've looked at the police reports, right?

3      A    I mean, from the police reports I got, I don't --
4  I don't got my interview.  I got pieces of it.

5      Q    Your attorney asked you do you recall making the
6  statement so y'all going to get a public pretender right
7  now.  Do you recall making that statement?

8      A    I recall asking that question.

9      Q    You recall asking that question.  So you recall
10  the police talking to you during this interview, correct?

11      A    Yeah.  I remember them talking to me.

12          MR. JENSEN:  And I'm going to object to the
13   form of that question assuming it's a fact not evidence
14   because he says he didn't ask are you going to get a
15   public pretender.  It says so y'all can get a public
16   pretender now.

17          THE COURT:  Fine.  Let's stop arguing about
18   the semantics of exactly what he said about the public
19   defender.  The record speaks for itself.  Obviously that
20   conversation came up.

21  BY MR. STINGL:

22      Q    And you recall, specifically, talking to them
23  about that, correct?

24      A    Yeah.

25      Q    And your statement now is that you are trying to

-47-

1    take the wrap for Sean Moore, correct?

2         A    Yes.

3         Q    And that was your whole purpose in talking to the

4    police regarding this homicide, correct?

5         A    Yes.

6         Q    And you, specifically, recall that, correct?

7         A    Yes.

8         Q    And that was the plan that you had according to

9    you?

10        A    Yes.

11        Q    So you had the mental capability of planning to

12   lie to the police, correct?

13        A    Yes.

14        Q    Okay.  Is there anything about that conversation

15   that you had with the police that you did not understand?

16        A    Yes.

17        Q    What?

18        A    Like when they was telling me -- when they was

19   telling me that the police was coming this way, and I kept

20   telling them that, no, I thought they was this way.  And

21   then they were telling me that their car was coming this

22   way when the car got struck because I told them we was

23   coming this way.  I didn't understand none of that.

24        Q    Well, you were telling them what happened?

25        A    Well, I was trying.

-48-

147

1    Q    You were correcting the police?

2    A    No.  They was telling me that, and I was trying

3    to counter that.

4    Q    Right.  Because what they were telling you was

5    wrong?

6    A    I mean, I don't know what they was telling me if

7    it was right or wrong.

8    Q    But you were telling them what happened, correct?

9    A    Yeah.

10    Q    You were telling them how the accident happened?

11    A    I was telling them -- I was trying to tell them

12    from Sean Moore perspective what happened.

13    Q    Okay.  But you were lying to them.  You were

14    putting yourself in the place of Sean Moore, according to

15    you, correct?

16    A    Yes.

17    Q    So you were telling them, for instance,

18    specifically, that you went through a red light, correct?

19    A    Yes.

20    Q    And that you were driving?

21    A    Yes.

22    Q    And you recall doing that to the police, correct?

23    A    Do I recall doing that?

24    Q    Lying to them?

25    A    Yeah.

-49-

148

1      Q    According to you.  So you recall this whole

2    interview that you had with the police?

3      A    I don't recall the whole interview.  I don't

4    remember.  I don't remember.

5      Q    Have you reviewed the interview?

6      A    No.

7      Q    Now, the ecstasy that you said you took, where

8    did you get it from?

9      A    Got it off the street.

10     Q    When?

11     A    That day.

12     Q    What day?

13     A    The day I turned myself in.

14     Q    And the day you turned yourself in you say you

15   wanted to take ecstasy?

16     A    Right.

17     Q    Do you have any hospital records from when you

18   went to the hospital?

19     A    I was in custody.  I don't need hospital records.

20     Q    The question requires a yes or no response.  Do

21   you have any hospital records from when you went to the

22   hospital regarding your anxiety attack?

23     A    I don't have nothing.

24     Q    Okay.  Well, neither do I and I wondered if you

25   have any, do you?

-50-

```
 1                  MR. JENSEN:  Asked and answered.

 2                  THE COURT:  Sustained.

 3     BY MR. STINGL:

 4          Q    Was any blood drawn from you at the hospital?

 5          A    Yes.

 6          Q    Do you have any records regarding that?

 7                  MR. JENSEN:  Asked and answered.

 8                  THE COURT:  Overruled.  Different question.

 9                  Answer, please.

10                  THE DEFENDANT:  I don't have no paperwork

11      from the hospital.

12     BY MR. STINGL:

13          Q    And tell us about why you went to the hospital;

14      how were feeling that you felt you needed to go to the

15      hospital?

16          A    I felt like -- like I was about to die.

17          Q    Okay.  What specifically and physically were you

18      feeling that you thought you were going to die?

19          A    My heart was beating rapidly.  It felt like -- it

20      felt like a hand was grabbing my heart.  I was sweating.

21          Q    And have you ever taken ecstasy before this date?

22          A    Yes.

23          Q    Is that something that you say happens when

24      you're on ecstasy?

25          A    Yes.  No, not the -- not the -- not the -- not
```

-51-

150

```
 1    the heart thing because I popped -- I think I did too much.

 2         Q    So when you take ecstasy, you realize what

 3    happens to you when you're on ecstasy?

 4         A    I take it like I could feel the effected.

 5         Q    And you know what happens.  You went to the

 6    hospital.  Your heart, you say -- and that's why the

 7    police -- you tell the police that something is wrong.

 8    They take you to the hospital, correct?

 9         A    Yes.

10         Q    Did you tell the people at the hospital that you

11    were on ecstasy?

12         A    No.

13         Q    Did you tell the people at the hospital that you

14    had taken any drugs?

15         A    No.

16         Q    Did you tell the people at the hospital that you

17    were under the influence of anything?

18         A    No.

19         Q    Did they ask you that?

20         A    No.

21         Q    You're in the hospital in the emergency room, and

22    they don't ask you that?

23              MR. JENSEN:  Objection.  Argumentative.

24              THE COURT:  Overruled.

25              Answer.
```

-52-

```
 1              THE DEFENDANT:  I don't remember.

 2   BY MR. STINGL:

 3       Q    Now, I think you said when your attorney was

 4   asking you questions, you did not tell the people at the

 5   hospital and you did not tell the police regarding the

 6   ecstasy because you didn't want to get in trouble; is that

 7   correct?

 8       A    Yeah.

 9       Q    Is that why you didn't tell the people at the

10   hospital?

11              MR. JENSEN:  Objection.  Vague.

12              THE COURT:  Sustained.

13              I got lost on that one.

14   BY MR. STINGL:

15       Q    Did you tell the people at the hospital that you

16   were on ecstasy?

17              MR. JENSEN:  Asked and answered.  Object.

18              MR. STINGL:  It's preliminary now so

19   everyone can understand what I'm talking about.

20              THE COURT:  Fine.

21              Overruled.

22   BY MR. STINGL:

23       Q    Did you tell the people at the hospital that you

24   were on ecstasy?

25       A    No.
```

-53-

```
 1      Q    Why did you not tell them that you were on
 2  ecstasy?
 3               MR. JENSEN:  Asked and answered.
 4               THE COURT:  Overruled.
 5               Answer, please.
 6               THE DEFENDANT:  What was the question again?
 7               THE COURT:  Why did you not tell the people
 8   at the hospital that you were on ecstasy; why did you not
 9   tell them that?
10               THE DEFENDANT:  I don't remember.  I don't
11   know.  Why would I?  I don't know.  Why would I tell
12   them?
13  BY MR. STINGL:
14      Q    Why did you not tell the police that you were on
15  ecstasy?
16      A    The police or the people at the hospital?
17      Q    Well, you already said you don't know why you
18  didn't tell the people at the hospital.  Now I'm asking you
19  why you did not tell the police when you were being
20  questioned that you were on ecstasy.  They asked you
21  specifically, correct, were you on any drugs?
22               MR. JENSEN:  Objection.  The question is
23   multiple in form.
24               THE COURT:  Somewhat.  Let's clarify.
25  BY MR. STINGL:
```

-54-

```
 1      Q    Did you tell the police that you were on ecstasy?

 2      A    No, I didn't.

 3      Q    Why not?

 4      A    I didn't want to get in trouble behind that too.

 5      Q    Okay.  I'm marking that there.  You did not want

 6   to get in trouble.  You're taking the wrap for killing an

 7   innocent woman; that's your testimony, correct?

 8      A    That was the statement.

 9      Q    Because it's only 15 years, right?

10           THE COURT:  Mr. Jones, answer the question,

11    please.

12           THE DEFENDANT:  Yes.

13   BY MR. STINGL:

14      Q    But you do not want to tell the police that you

15   took ecstasy because that would get you in trouble; is that

16   what you're saying?

17      A    I don't want no more time than that.

18      Q    Do you think taking two ecstasy pills will catch

19   you 15 years?

20           MR. JENSEN:  Objection.

21           MR. STINGL:  Well, I want to know what's in

22    his head.  Does he think that taking ecstasy is going to

23    catch him 15 years?

24           MR. JENSEN:  Wait, are you asking me or is

25    that a question?
```

-55-

```
 1                MR. STINGL:  I'm asking the witness.

 2                MR. JENSEN:  Then I object to the form of

 3       the question.

 4                THE COURT:  Overruled.  It's relevant.

 5                THE DEFENDANT:  I -- I wasn't -- I wasn't

 6       thinking.  I was -- I done pop some pills.  I wasn't

 7       thinking if I should tell the police if I should -- If I

 8       should if -- if -- if -- if -- if ain't pop some pills or

 9       not.  I just want to hurry up and get the interview done

10       with.

11  BY MR. STINGL:

12       Q    So the answer is what, yes or no?  Do you think

13  telling them about the ecstasy is a 15-year crime?

14       A    No.  I don't think that.

15       Q    And while you were manipulating the police by

16  lying to them, you're saying that because it's only 15

17  years then, you're going to take the wrap for Sean Moore?

18                MR. JENSEN:  Objection.  Asked and answered

19       and argumentative.

20                THE COURT:  It has been asked and answered,

21       but it's somewhat relevant to where we are now.

22       Overruled.

23                Answer the question, Mr. Jones.

24                THE DEFENDANT:  I don't get the question.

25  BY MR. STINGL:
```

-56-

Johnny Jerome Jones v. Reed Richardson,
No. 16-C-712 (E.D. Wis.)
Case 2:22-cv- Document: 10    Filed: 07/27/2022    Page: 68    Page 397 of 992

Exhibits to Habeas Answer

```
 1        Q    I'll ask it this way.  Let me take it step by
 2   step and you answer yes or no if I'm wrong.  You just tell
 3   me because I'm trying to figure out your testimony.  You're
 4   telling us that you lied to the police about driving,
 5   correct?
 6        A    Correct.
 7        Q    And one of the reasons that you lied to the
 8   police is that you found out that it was only 15 years you
 9   were looking at, correct?
10        A    That's one of the reasons, yes.
11        Q    That's one of the reasons, correct?  Tell us the
12   other reasons?  I'm giving you the opportunity.  Tell us
13   the other reasons that you lied to the police?
14        A    Well, well, in 1998, you know, clearly that I
15   didn't take a statement.  So when I did take this
16   statement, I knew that -- I knew -- I kind of figured -- I
17   kind of figured that -- that lying -- that lying would go
18   ahead and save Sean.  That's another reason.  I want to
19   finish.
20        Q    Let me take it one step at a time.
21             THE COURT:  Hang on, Mr. Stingl.
22             MR. JENSEN:  Give him an opportunity.
23             MR. STINGL:  Fine.
24             THE COURT:  Hang on.  Let him finish.
25             Finish your answer, Mr. Jones.
```

-57-

1              THE DEFENDANT:  His girlfriend kept on

2       calling me, talking about how she pregnant, how she

3       pregnant, how Sean can't go to jail for this shit, excuse

4       my language.  How Sean can't go to jail for this.  How

5       she know -- you got to go and take the wrap for Sean.

6              Sean been looking out for me.  He been doing

7       odds -- he been doing odd kind of stuff for me, anyway.

8       He been -- he been buying me clothes.  He been --

9       friendship-type stuff.  He been buying me clothes.  He

10      been filling up the gas tank.  He been -- we kick it

11      every day.  We hang out every day.  Either I let him take

12      at the time what I'm thinking like 30 years in jail where

13      I take -- where I take two, three years.

14             Both of us just been down a nice piece of

15      time.  This is the only thing -- you all see -- you all

16      see clearly that the police -- the police seen him -- the

17      police seen him -- the police seen him jump up the curb.

18      I'm sitting right here.  The police seen him jump out the

19      car.  The people walking down the street seen him jump

20      out the car.  They all know I am lying.  The detectives

21      knew I was lying during the interview.  They knew it.

22      BY MR. STINGL:

23      Q      Then why did you lie?

24      A      Because if it's only two or three years -- two or

25      three years I could do that.  I'm been in the county jail

                              -58-

1   for 20 months.

2        Q    And all of that was going through your mind when

3   you're talking to the detectives?

4        A    All this going through my mind from the time --

5        Q    I'm asking you --

6        A    From the time --

7        Q    No.  I'm asking you all of this that you just

8   stated and the Court let you talk, all of that was going

9   through your mind when you're taking the wrap and giving

10  this statement; yes or no?

11       A    No.  It's going through my mind prior to this and

12  during the statement.

13       Q    So then during the statement, you carried out

14  your plan to take the wrap for Sean Moore?

15       A    Yeah.

16       Q    You knew what you were doing?

17       A    That was a question?

18            **THE COURT:**  That was a question.  Answer the

19   question.

20            **THE DEFENDANT:**  Yeah.  Yes, yes.

21  **BY MR. STINGL:**

22       Q    Two-and-a-half weeks the police were looking for

23  you after December 31st, correct?

24       A    Yes.

25       Q    And you knew the police were looking for you,

-59-

```
 1    correct?

 2         A    Yes.

 3         Q    And you ran outside of Milwaukee County to get

 4    away, didn't you?

 5              MR. JENSEN:  Objection.  Relevance.

 6              MR. STINGL:  It goes to his state of mind.

 7              THE COURT:  Overruled for now.

 8              You can answer, sir.

 9    BY MR. STINGL:

10         Q    Correct?

11         A    What was the question?

12         Q    You ran from the police, correct?

13         A    Yes.

14         Q    How far did you get?

15              MR. JENSEN:  Objection.  Relevance.

16              THE COURT:  I presume it's the same

17    explanation.  Overruled.

18              MR. JENSEN:  Well, it is except we know that

19    he ran from the police.  I don't think it's relevant

20    where he ran to.

21              THE COURT:  It may or may not be.

22    Overruled.  I'll cut it off if it goes too far.

23              You can answer, Mr. Jones, please.

24              THE DEFENDANT:  I ran to Green Bay.

25    BY MR. STINGL:
```

-60-

1    Q    Stopped in Sheboygan for awhile, correct?

2    A    Yes.

3    Q    Made it to Green Bay.  And during that time, did

4    you ever try to contact an attorney?

5    A    Yes.

6    Q    How did you try to contact an attorney?

7    A    Through the telephone but I had no money.

8    Q    And so the fact that you had no money, you knew

9    that you could call a public defender, correct?

10    A    No.  I didn't know that.

11    Q    Well, you knew it when you gave the statement to

12    the police, correct?

13    A    The police told me -- when they told me during

14    the interview -- I didn't know when I could call them when

15    I was on the run.

16    Q    You did not know that before getting arrested you

17    could call attorneys?

18    A    Public defender I did not know that.

19    Q    That's something you learned during the rights

20    that they read to you?

21    A    I'm just now learning that.  You're telling me

22    this.

23    Q    Then why did you ask for a public pretender,

24    according to you?

25    A    Because I thought that you could get one during

-61-

1    the course of the interview.

2        Q    So you understood the rights as they were read to

3    you?

4        A    That's the reason why -- that's the reason why I

5    ask that I get one, a public pretender.

6        Q    So the answer to my question did you understand

7    the rights read to you is what, yes or no?  Did you

8    understand those rights?

9        A    Yes.

10            **MR. STINGL:**  I don't have any further

11    questions.

12            **THE COURT:**  Any follow up?

13            **MR. JENSEN:**  No.

14            **THE COURT:**  Fine.

15            The defense rests?

16            **MR. JENSEN:**  Yes.

17            **THE COURT:**  State have any rebuttal?

18            **MR. STINGL:**  No.

19            **THE COURT:**  The way I see it, we can dispose

20    of the issues about the ecstasy pills; whether the

21    defendant was under the influence, and the comment about

22    whether he could or could not get 15 years in prison

23    today.

24            I'll set over for a week a short briefing

25    schedule on the issue of the comment about the 29-minute

-62-